Mamie R. HENDERSON, Plaintiff,

v.

**FIRST NATIONAL BANK OF MONTGOMERY, Defendant.**

Mamie R. HENDERSON, Plaintiff,

v.

**PEOPLES BANK & TRUST CO., Defendant.**

Amy HAWKINS, Leola Burrell, for themselves and all others similarly situated, Plaintiffs in Intervention,

v.

**FIRST NATIONAL BANK OF MONTGOMERY, Defendant in Intervention.**

Civ. A. Nos. 3592–N, 3593–N, 3755–N.

United States District Court,
M. D. Alabama.

June 28, 1973.

amendment, a violation of Title 42 U.S.C., Section 1981, by defendants, First National Bank of Montgomery and Peoples Bank and Trust Co. Amy Hawkins and Leola Burrell were permitted to intervene individually against the First National Bank of Montgomery on August 29, 1972 and permitted to intervene individually against Peoples Bank and Trust Co. on September 21, 1972, alleging a violation of Title 42 U.S.C., Section 1981.[1]

Plaintiff Henderson and plaintiff-intervenors Hawkins and Burrell alleged that they were denied employment by defendants solely because of their race and that defendants have engaged and continue to engage in a pattern and practice of racial discrimination in their recruiting, hiring, testing and promotion practices. Plaintifff and plaintiff-intervenors seek judgment declaring that defendants have engaged in a pattern and practice of racial discrimination in their employment practices and ask for an injunction:

(1) Permanently restraining them from continuing racially discriminatory employment practices; and

(2) Ordering them to take whatever affirmative action necessary to remedy the effects of past discriminations.

Discovery in the cause began at the date of filing the initial complaint and continued until the date of trial, the Court permitting plaintiffs wide latitude during the discovery process. Trial of the cause began on March 12, 1973 and ended on March 15, 1973.

Howard A. Mandell, Joseph J. Levin, Jr., Montgomery, Ala., for plaintiffs.

M. Roland Nachman, Jr., and Truman Hobbs, Montgomery, Ala., for defendants.

HAND, District Judge.

The above-styled causes originated on February 16, 1972 when plaintiff, Mamie R. Henderson, on behalf of herself and others similarly situated, filed in the United States District Court for the Middle District of Alabama a complaint in Equity alleging a violation of Title 42 U.S.C., Section 2000e et seq. and by

## PRELIMINARY COMMENT

The Court is most impressed with the conscientious effort put forth by plaintiffs' counsel in this cause. The elimination of equitable relief claiming monetary damages in the nature of back pay reflects acute assessment of the facts and shows the sincerity of the parties and counsel in attempting to alleviate

---

1. No complaint was lodged by these plaintiffs with the Equal Employment Opportunity Commission as required by 42 U.S.C., Section 2000e et seq.

what they feel is the racially discriminatory practices of defendants, without trying to build a case of economic benefit to themselves. The Court has heard numerous civil rights cases; in fair employment, education, prisoner petitions and other matters. While the Courts have held that civil rights complaints are primarily equitable in nature with monetary damages incidental to the primary issues, this Court has observed all too often in the pretrial and discovery procedures of many of these causes as well as at the hearings themselves and during settlement discussions, that some plaintiffs have rather noticeably placed the recovery of monetary damages as the primary aim with violation of civil rights as an aside consideration.

Second, the Court is impressed by the fact that the parties defendant have now obviously put forth sincere efforts to promote fair employment. Their affirmative action programs, their race relation activities in the community and their current recruitment activities all testify to this. The Court also notes that this was a proper case for settlement based on the Banks' past activities. Although they are currently fulfilling their obligations under the law, the carry over effects of past practices are still being felt as will be spelled out more specifically in the Findings of Fact and Conclusions of Law.

Upon consideration of the pretrial agreement, pleadings, legal briefs, arguments of counsel, testimony of witnesses and exhibits, the Court finds as follows:

## FINDINGS OF FACT JURISDICTION

1. This Court has jurisdiction of this case pursuant to 28 U.S.C., Section 1343(4), 42 U.S.C., Section 2000e–5(f). Defendants are charged with violating (a) Title VII of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e et seq., (b) 42 U.S.C., Section 1981 providing for the equal rights of all persons in every state and territory within the jurisdiction of the United States;

2. First National Bank of Montgomery is an employer in an industry affecting interstate commerce within the meaning of Section 706(b) of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e–5(f).

3. Peoples Bank and Trust Company is an employer in an industry affecting interstate commerce within the meaning of Section 706(b) of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e–5(f).

4. Plaintiff, Mamie R. Henderson, has complied with the procedural requirements of Section 706(a), (d) and (e) of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e–5(a)(d), and (e).

## CLASS ACTION

5. This action was initiated as a class action pursuant to Federal Rules of Civil Procedure 23. The Court finds this is a proper class defined as follows:

"Black applicants, both past and future and black employees of defendants, First National Bank of Montgomery and Peoples Bank and Trust Company."

On March 2, 1973 this Court entered an Order limiting the issues in this litigation insofar as class determination is concerned to:

(a) Employment practices in hiring;

(b) Test validation; and

(c) Whether or not defendants are discriminating by employing only those blacks who would not quality under normal promotional opportunities for promotions to officers or to a higher echelon in the bank organizations, the parties having stipulated that defendants are not guilty of (c).

The Court further limited the class to representing promotional opportunities of employees to those positions below the rank of officers positions as it felt this class could not adequately represent the officers positions. Any other issues which could be raised but which were

not specified would be deemed not in dispute and barred from further litigation by the decree to be rendered herein.

## INDIVIDUAL CHARGES OF DISCRIMINATION

### Mamie R. Henderson

A.  First National Bank of Montgomery

On October 27, 1969 Mamie R. Henderson on an application form executed in her handwriting, applied to FNB for employment in the position of "File Clerk, Teller or Proff (sic) Machine". Three days later Mrs. Henderson was given a pre-employment aptitude test. The form of test employed was the American Bankers Edition Short Employment Test of the Bennett-Gelink Test prepared by Dr. George Bennett of The Psychological Corporation. This test has been administered by FNB since 1951 to applicants for the positions for which Mrs. Henderson applied.

Within a period of two to three weeks thereafter, Mrs. Henderson was advised by a personnel department employee of FNB, Mrs. Ruth Ott, that she had scored in the fourth percentile on the test; and that as a result of her exceedingly low score, she could not be considered by the bank for employment in the positions for which she had applied.

No applicant at FNB—regardless of race—who scores below the thirty-fifth (35) percentile on the ability tests given to Mrs. Henderson is accepted for employment in any of the positions for which Mrs. Henderson applied. This cut-off point has been established by FNB on the basis of its experience of almost twenty (20) years with these tests, and accords with Manual recommendations.  (FNB Ex. 7, pg. 29).

These tests, which were given to Mrs. Mamie Henderson at both banks, were of three (3) types—Verbal, Numerical and Clerical Aptitude.  They will be described in detail below.

Mamie Henderson attempted twenty-three (23) of the verbal items; missed fourteen (14) of them; and answered nine (9) correctly.  On the numerical test, she attempted seventeen (17) items; answered fifteen (15) correctly; and missed two (2).  On the clerical speed and accuracy test, she attempted sixteen (16) items; answered fourteen (14) correctly; and missed two (2).  Her total score on the test administered by FNB was thirty-eight (38).

Mrs. Henderson's performance placed her in the bottom one percent (1%) of those tested, being surpassed by well over ninety-nine percent (99%) of applicants for the bank jobs for which she applied.

█ The evidence in this cause makes it plain that Mamie Henderson was denied employment there because of her exceedingly poor performance on the pre-employment tests and for no other reason.

B.  Peoples Bank and Trust Company

Upon the occasion of Mrs. Henderson's initial application at Peoples, she contended she was interviewed by Mr. Sims, who was its personnel officer, operations officer, cashier and vice president, and that Mr. Sims made the decision not to employ Mrs. Henderson.  Approximately six months after this interview, when an official of the EEOC contacted Mr. Sims regarding Mrs. Henderson's application for a job with Peoples, Mr. Sims was unable to recall Mrs. Henderson.  He contended he had interviewed approximately a hundred job applicants in the interim between Mrs. Henderson's alleged interview and the contact by the EEOC representative.  From the Bank's records, Mr. Sims was able to state that Mrs. Henderson was not given a pre-employment test at the time of her original contact with the Bank in October, 1969. (Sims' Deposition, p. 9).

Mr. Sims testified that Peoples did not give employment tests to all applicants.  Normally applicants were not given tests if jobs were not available. (Dep., p. 9).  Mr. Rogers, the successor to Mr. Sims, testified that if a job was not available within a month of the time an applicant sought employment, Peoples

did not try to contact the applicant in the event of a vacancy because it was always proved a waste of time. Peoples' experience was that the applicant had gone to work elsewhere or could not be found. Although Mr. Rogers made it clear that giving a test when there was no probable vacancy could be a waste of time for applicant and the Bank, he testified that after the EEOC complaint alleging discrimination by Peoples for failure to test Mrs. Henderson, Peoples' attorney recommended all applicants be tested even if no job was available or in prospect. This has been done at both Banks in an effort to avoid the charge either that blacks are tested more often or less often than whites.

In May of 1971, Peoples was contacted by letter by the Director of EEOC concerning Mrs. Henderson's complaint against Peoples. Upon receipt of the letter, Peoples informed the EEOC that it had no information with reference to Mrs. Henderson's prior contact with the Bank, but offered to give her a second interview in view of the fact that a position as a teller was open at that time and Peoples advised that it would employ Mrs. Henderson for the position if she was deemed qualified. Mrs. Henderson was interviewed by Mr. Rogers, who had succeeded Mr. Sims as personnel officer. She was given the SET pre-employment test, the same tests utilized by First National Bank, administered in the same way as to hundreds of other job applicants at Peoples. Her score on the arithmetic test was 12, which was less than half that of the lowest score of anyone employed at Peoples as a teller. Mrs. Henderson scored substantially lower on this test than any of the 158 applicants who had been tested by Peoples for the position of teller or any other clerical position during the ten months preceding the giving of the test to Mrs. Henderson. Her score on the clerical test was 10, and on the verbal an 8. Her average score on the three parts of the test were one-fourth the average for Peoples' clerical employees who had taken the test.

At approximately the same time Peoples tested Mrs. Henderson, it also tested another black applicant for the same position as teller. The other black applicant, Mrs. Mary Palmer, scored a 42 on the arithmetic portion of the test on which Mrs. Henderson scored a 12. Mrs. Palmer's scores on the other portions of the test were more than double the scores of Mrs. Henderson. Mrs. Palmer was employed by Peoples. Her arithmetic score of 42 was substantially the same as the average score for all teller employees at Peoples.

■ The Court finds no discrimination in Peoples' failure to give a test to Mrs. Henderson when there is no indication that a job was available at the time of her initial application, the policy of Peoples at that time being to test only if a job was available, this policy being followed both as to whites and blacks.

■ Moreover, when the EEOC wrote Peoples a letter relative to Mrs. Henderson, Peoples offered to reinterview her and give her a job as a teller if it deemed her qualified. When she was not deemed qualified based on test scores substantially below those of any applicant for a clerical position who had taken the test, Peoples hired another black for this job. It is difficult to read racial discrimination into the passing over of Mrs. Henderson when the position was filled by another black.

## OBSERVATION

The decision by both the First National Bank and the Peoples not to employ Mrs. Henderson was in part based on her test scores and in part based on the impressions and appreciations of her ability garnered by the interviewer, as shown by the testimony in this case. From the Court's personal observation of Mrs. Henderson and her demeanor while testifying, the Court is impressed that even if the testing itself be held to be discriminatory because not properly job validated or not properly utilized, as it involved screening of job applicants, a matter to which the Court will address

itself later, the Court concurs with the decision of the parties defendant in their determination not to employ Mrs. Henderson as not being qualified to hold the class of job to which she had applied and concurs that the decision of the Banks in this particular did not result from racial bias or discrimination.

### AMY SMITH HAWKINS

A. First National Bank of Montgomery

The parties have stipulated the following facts regarding Mrs. Hawkins:

"Mrs. Hawkins first applied to FNB for a clerical position on May 21, 1971. On June 4, 1971, she was given the Short Employment Tests already discussed and scored well, in the sixty-eight (68) percentile. At the time of her application she was completing her sophomore year at Alabama State University and had already selected courses for her junior year which would commence in the fall of 1971. Mrs. Hawkins (who was then Miss Smith) informed the bank personnel interviewer at the time of her application that she was tired of school at the present time and might go back to school later. She felt that the test was fairly administered by FNB and that the Numerical and Clerical tests were 'necessary'.

"Mrs. Hawkins did in fact return to Alabama State University for her junior year which she completed in the spring of 1972. She did not contact FNB from July of 1971 until August 9, 1972. She was told that there were no openings at that time."

█ FNB—as shown on the impression sheet and from the testimony of Lawrence Tipton—denied employment to Mrs. Hawkins because it questioned her intention to remain an employee on a permanent basis. FNB, quite within the realm of managerial responsibility, determined that Mrs. Hawkins' status as a student indicated a probability that she would return to college when the fall term began. This is precisely what she

did. The fact that she was given a test does not subvert FNB's determination, since it, from time to time, tests persons who are not going to make a definite commitment (Tipton Dep., p. 66; see also Edney Dep., pp. 26–27).

Accordingly, the Court finds that Mrs. Hawkins' application for employment at FNB was not denied because of her race, but instead, because she was a student whose permanency was appropriately questioned. She has not proved a case under Section 1981 and is entitled to no relief.

B. Peoples Bank

█ Mrs. Hawkins testified that she made application for a job at Peoples on a thin card-like form of one sheet in May, 1971. She testified that the personnel officer at Peoples told her the Bank would call her to tell her when to come in and take a test.

Peoples had no record of Mrs. Hawkins ever having applied to it for a job. Peoples has never used a thin card for an application. (Its application forms have been attached to its answers to interrogatories.) The Bank has diligently searched all applications which are kept in its files for a number of years, and no application from Amy Hawkins or Amy Smith is in its records. Mrs. Hawkins could not identify the person with whom she had an interview.

Mrs. Hawkins testified that the Bank never contacted her to come and take the test, and she never called or attempted to contact Peoples in any way.

Mrs. Hawkins testified that when she went to Peoples she was accompanied by a black, Mary Palmer. The personnel officer recalled that when Mrs. Palmer contacted Peoples, she did not have an interview but left an application. When the application came to his attention shortly after Mrs. Palmer left her application, he noted on her application that she had had prior banking or related experience. Accordingly, he called her by telephone and asked her to come in for an interview and the test. She scored well on the tests and went to work at

Peoples in July, 1971. She remained in Peoples' employ until she resigned to go to Texas with her husband approximately two months later.

The Court finds that Mrs. Hawkins did not prove a case of racial discrimination against Peoples.

## LEOLA BURRELL

A. First National Bank of Montgomery

Plaintiff-intervenor Leola Burrell, a black female, first applied to FNB in the summer of 1969. She had completed 5 months of business school in 1967 and had, at the time she applied, completed her first year at Alexander City Junior College, where she had taken typing, bookkeeping, office machines and other secretarial courses.

At FNB she filled out an application form and was interviewed. While she was told that she would be contacted about taking the test, she never heard from anyone at the Bank.

Mrs. Burrell reapplied to FNB in June of 1970. She had just completed her second and final year at Alexander City Junior College, where she had taken the advanced business courses. Mrs. Burrell was not tested and was told that there were no openings and that she would be notified when one became available. Mrs. Burrell testified that she heard nothing from FNB from June until sometime in August, 1970, when she and her husband moved to Dothan.

In August of 1972, Mrs. Burrell reapplied to FNB after she and her husband had returned to Montgomery. Mrs. Burrell spoke with the receptionist, asked if she had to fill out a new application, and asked if she could take the pre-employment test. The receptionist responded that since the Bank did not have any positions available there was no reason for her to take the test, but that her application was still on file and she would be contacted when an opening arose.

B. Peoples Bank and Trust Company

Mrs. Burrell applied to Peoples Bank in September of 1972. There she first spoke with the receptionist who gave her an application form to fill out and who told her that three positions were currently open: (1) teller, (2) master charge clerk, and (3) switchboard operator. She was invited back to take the Bank's pre-employment test. Several days later she returned to the Bank and took the test. After completing the test, she was interviewed and told by the Bank's personnel officer, Mr. Rogers, that she had passed the test and that she should go over to one of the Bank's branches to be interviewed for the job of Master Charge clerk.

She was interviewed by the Branch Manager and administered a typing test. Mrs. Burrell admitted at trial that she performed poorly on the test, testifying that she had not used her typing skills since she left Alexander City College in the spring of 1970. No other job position was available or offered Mrs. Burrell by Peoples.

## SUMMATION OF INDIVIDUAL CHARGES

The Court is convinced that neither plaintiff, Mamie R. Henderson, nor plaintiff-intervenors, Amy Smith Hawkins and Leola Burrell, had their job applications processed any differently than other job applicants during the normal procedure of processing applicants seeking employment at either the First National Bank of Montgomery or Peoples Bank and Trust Company. Plaintiff and plaintiff-intervenors have not proven to the Court the facts in their individual cases are any different from those of white job applicants nor have they convinced the Court that their individual failure to obtain employment at either Bank was based on their race. Their only recourse is whether the Banks discriminated against them as members of a class by utilizing a hiring device (tests) which is neither job related nor job validated. This validation will be discussed separately.

## RECRUITMENT AT FNB

On May 11, 1965, prior to the effective date of the Civil Rights Act of 1964, FNB's Board of Directors resolved to comply fully with the provisions of that Act, which is, of course, academic, as all employers are required to comply with the law. What is not academic is FNB's desire and zeal to comply with that law and, moreover, to improve race relations in its community and state both from a sociological standpoint and from an appreciation of the best advantages to be gained from the expanding of a qualified labor force.

The Court has been impressed by the testimony of the top executives of FNB and of responsible and strategically placed black leaders; and by extensive documents which substantiate FNB's efforts to recruit qualified black personnel. The president of predominately black Alabama State University, Dr. Levi Watkins; the principal of predominately black George Washington Carver High School, William Thompson; the assistant superintendent of education for Montgomery County, L. L. Garnier; the executive director of Central Alabama Opportunities Industrialization Center, Consuello Harper; and the equal opportunity officer of Montgomery Community Action Agency, Isaac Forbes— all black persons themselves—commended FNB's recruitment efforts. Mr. Forbes, on February 21, 1973, submitted a memorandum (FNB Ex. 57) in which he stated that this Bank "is in full compliance in providing equal opportunity to all depositors and employees."

The record also reflects photographs in posters and newspaper advertisements showing black and white employees; and the posters have been placed at predominately black centers for recruitment purposes.

These matters are persuasive documentation of FNB's efforts. There are letters as early as May, 1965, from FNB's top personnel officials to placement officials in such predominately black centers or institutes of learning as Alabama State University in Montgomery; Tuskegee Institute in Tuskegee; A. G. Gaston's insurance company in Birmingham; and Trenholm State Trade School in Montgomery. FNB more than five (5) years ago advertised in newspapers that it was an "Equal opportunity employer". (FNB Ex. 34).

Moreover, FNB, subject to Executive Order 11246 and Treasury Regulations pertaining to equal employment opportunity, has received commendation from the Office of the Secretary of the Treasury for its affirmative action to secure qualified black employees. On July 17, 1972, the Treasury Department, Director of Equal Opportunity, David Sawyer, wrote that FNB's program "is most impressive . . . and it is with pleasure that I find (FNB) in compliance . . . ." (FNB Ex. 9). On January 23, 1973, this Director communicated his commendation to FNB that its "continued cooperative efforts in this important area of equal employment opportunity are appreciated". (FNB Ex. 11).

The results of these efforts (as shown on FNB Ex. 10) were that as of December 31, 1972, there were fifty-six (56) black employees at FNB, and three (3) others had left the Bank's employ during 1972. This Exhibit 10 shows blacks employed in the mortgage and installment loan departments; in the public relations department (women's division); in an officer capacity; in the management training program; and in numerous auditing and bookkeeping positions. See also the statistics contained in FNB's Ex. 16.

During the entire year 1969 only fifty-three (53) blacks applied for employment at FNB and only nine (9) scored in the thirty-fifth percentile or better on the SET tests. Even for the first eight (8) months of 1972, when applications had increased to two hundred ninety-six (296), only forty-eight (48) black applicants scored as high as the thirty-fifth percentile on these tests.

During the same period almost 13% of the new hires were black. Indeed, for the first eight (8) months of 1972, 21.3% of all of the new hires were black; and the record is plain that even a larger percentage of new hires during the remaining portion of 1972 were black.

Even more striking is the fact that the average test scores of whites hired was almost ten (10) points higher than that of blacks hired; and 39% of the blacks who passed the test were hired, but only 36.3% of the whites who passed were hired.

The Court is impressed with the good faith efforts of FNB to recruit competent black employees. The Court finds that FNB is not now discriminating against black persons in its hiring practices.

In summation, a showing of historical pre-Act racial discrimination does not establish a per se violation of Title VII of the Civil Rights Act of 1964. The Courts are concerned with the present terms and conditions of employment alleged to violate Title VII. Where there have been found a causal nexus between the past discrimination and challenged present conditions of employment, not justified by some "business necessity", which itself complies with Title VII, the Courts having held that the present condition violates Title VII, and relief has been granted even in the absence of a showing of present intent to discriminate and even in the presence of a showing of present good intent towards alleged discriminations. Thus, as the Court has previously stated the decision-making authorities of the First National Bank fully intended to comply with Title VII at the very inception of the Act, but unfortunately the employees who continue to do the actual day-to-day personnel replacement operations continued to rely primarily on referrals from current employees. Prior to the calendar year 1965 and during the calendar years 1966, 1967 and 1968 over 90% of the First National Bank's em-ployees were white. Thus the personnel department's primary reliance on referrals from current employees during 1966, 1967 and 1968 was perpetuating past discriminating practices. It was not until 1969 when a truly conscious effort was made by the FNB to actively recruit blacks in order to comply with the law and the directive laid down by the executive officers of the Bank to bring the Bank in compliance with the Act. This is not to say that Title VII required employers to recruit members of a specific class, but when an employer's personnel are predominately of a certain class, this employer cannot rely solely or primarily on this class as its principal source of referrals of potential employees but must have other active means to obtain and recruit members of other classes until such time as it is apparent the employed personnel is not comprised of a specific class. As a result of this practice during 1966, 1967 and 1968, equitable relief will be granted and ordered as more specifically set out in the relief section.

## RECRUITMENT AT PEOPLES BANK AND TRUST COMPANY

Peoples was organized and commenced its banking operations in 1957 with a single location in Normandale, a Montgomery Shopping Center. It commenced operations with a total of nine (9) employees and two (2) officers. Until 1969 its main office was still at Normandale. In 1969, Peoples moved its principal banking operations downtown into its newly constructed building, including its "personnel department".

Prior to moving its main offices to downtown Montgomery, Peoples had never had a black initiate an application for a clerical position. However, in 1967, Mr. Gaddis, the President of Peoples, called the black director of the Trenholm Trade School and asked his assistance in obtaining blacks who might be interested in clerical employment at Peoples. The director sent two (2) blacks for an interview with Peoples. Both appeared to be qualified, but one

(1) lived some distance from Montgomery and transportation problems caused her to decline employment. The other black, Yvonne Riley, was hired by Peoples on January 16, 1968. She worked in the savings department, the check imprint department, and as a teller in the Normandale office. She resigned her employment at Peoples after approximately one (1) year in order to take a higher paying job.

Mr. Gaddis testified of his other efforts to recruit qualified black applicants. In addition to the assistance he sought and obtained from the director at the trade school, he sought the help of Dr. Levi Watkins, the black president of Alabama State University; Dr. Watkins' Assistant, Mr. Henry Spears; Mr. William Thompson, black principal of predominately black Carver High School; and Mr. Walter Spiro, manager of a Community Action program. These efforts at recruitment go back in time at least to 1967. Mr. Gaddis did not come with Peoples until 1966 following the death of its first president. At that time Peoples had approximately thirty-five (35) employees and five (5) officers. Mr. Gaddis is on the Board of Directors of Urban League and also sought the help of its black director in recruiting blacks. In evidence also is a letter from Mr. Rogers, the Personnel Officer at Peoples, in response to an offer from Mr. Alvin Holmes of the Urban League to assist in recruiting black job applicants. Mr. Rogers also sought the help of a black, Mrs. Hewitt Brown, the distributive education coordinator of Carver High School, in securing a black DE student. Peoples has had such a student from Carver High School for approximately eighteen (18) months. These efforts impress the Court with the initiative of this small Bank in recruiting black applicants for employment.

Plaintiffs argue that Peoples relies for its applicants to too large an extent on employment agencies and referrals from other banks. The testimony of Peoples' personnel officer is that Peoples does not contact employment agencies for applicants because it has more than enough qualified applicants, and he does not wish the applicant to incur an unnecessary expense in obtaining a job at Peoples. He has advised employment agencies not to send applicants to Peoples. Peoples does no advertising for applicants because the supply is more than adequate.

Peoples' personnel officer acknowledges that Peoples gives preference to applicants who have had prior banking or bank related experience. He testified that it takes about three (3) months to train a teller with no previous experience whereas an applicant with prior teller experience can work into the routine of the job at Peoples within a few days. Since the average period of employment of a teller at Peoples is approximately fifteen (15) months, there is a substantial savings in efficiency and money if the Bank can hire persons with prior banking experience. Such preference by Peoples is based on the applicant's ability to do the job and is not based on race.

The Court finds, moreover, that Peoples has done an excellent job of recruiting black applicants. The statistics tell the story.

The number of black applicants at Peoples has steadily and dramatically increased from one (1) in 1968, to eleven (11) in 1969, to forty-one (41) in 1970, to sixty (60) in 1971, to ninety-three (93) in 1972, tenfold in the last four (4) years.

The percentage of applicants who are black increased from twelve percent (12%) to thirty percent (30%) in this four-year period. The increase is attributable to the move of Peoples to downtown Montgomery, the recruiting efforts of Peoples, and the increasing number of black employees. The number of black applicants at Peoples in 1972 is more than three times the total number of applicants, white and black, five (5) years ago.

The only active recruiting efforts by Peoples revealed in this record have

been to recruit blacks. This small Bank gets substantially all of its employees from applicants who initiate the contact with the Bank.

Although Peoples had never had a black clerical applicant for employment until 1968 and the first black applicant was hired in January, 1968, Peoples had nineteen (19) blacks among its new hires subsequent to January 1, 1968. Blacks were performing the following jobs at the date of the trial: four (4) tellers, one (1) secretary, one (1) bookkeeping clerk, one (1) statement clerk, one (1) supply clerk, one (1) maintenance man, two (2) couriers, and one (1) file clerk. Although nine (9) of the nineteen (19) blacks who had been employed during the past five (5) years had terminated their employment by trial date, including several tellers and other clerical employees, twelve (12) blacks were still employed at Peoples at the time of this trial. At the time of this trial, fourteen percent (14%) of the employees at Peoples were black. This statistic must be considered along with the fact that Peoples had no clerical employees who were black until it recruited Yvonne Riley in January of 1968, and of its white employees who were employed prior to year-end 1968, Peoples still has thirty-one (31) of those employees in its employ.

Peoples has submitted a chart which shows that of the one hundred sixty-three (163) whites hired at Peoples since January 1, 1968, one hundred twenty-one (121) had prior banking or directly related experience. Thus, seventy-five percent (75%) of all whites employed had such experience. Among the blacks, only four (4) hires had prior banking or directly related experience. This represents twenty-one percent (21%) of the black applicants with such experience. These figures fully support the contention of Peoples that it gives great weight to the prior experience of an applicant.

The SET is not used at either Bank as the sole criteria for employment. The fact that A scores higher than B in no way assures that A will be hired. The primary use of the tests at both Banks has been to establish a minimum score below which applicants would not be considered for employment in certain jobs. At Peoples, the cut-off is a score of twenty-five (25) on the numerical test for one seeking a job as a teller, proof machine operator or bookkeeper. This cut-off eliminates from consideration approximately thirty percent (30%) of the black applicants and approximately fifteen percent (15%) of the white applicants. Although Peoples has given consideration to the test scores in selecting employees who score above the minimum, the Court is impressed that the average scores on the test for whites who have been employed is substantially above the average scores for blacks. Thus both Banks, in their hiring practices have sought to minimize the impact of a substantially higher average score of white applicants.

## LABOR MARKET

In connection with any discussion of employment practices, an eye should be kept on the size of the labor pool available. The labor statistics supplied by the last census for Montgomery and Montgomery County show that this is a high employment area. For example, out of a work force of 83,770 only 3,425 are shown as unemployed. Out of a minority work force of 26,390 only 1,180 are unemployed. Since Banks hire more females than males, the unemployed minority females consist of 645 out of a force of 12,690. Thus it becomes readily apparent to the Court that the Banks do have a problem locating qualified applicants. Also, the testimony reflects that blacks are in great demand and the salary ranges for Bank employees is generally less than the competing markets.

First National Bank of Montgomery is a national banking association and employs approximately 500 persons, including officers. Peoples Bank and Trust Company is a state bank with substantially less than 100 employees.

They are both located in Montgomery, Alabama.

Employment in this area is greatly influenced by governmental agencies and their service related suppliers, as both Maxwell A.F.B. and the State Capitol Complex are located in this city. There are also several colleges and many medium size industries, as well as numerous large retail outlets serving both this community and the rural surrounding counties.

### TESTING

Both the First National Bank of Montgomery and Peoples Bank and Trust Company utilize the American Bankers Edition Short Employment Test of the Bennett-Gelink Test (hereinafter referred to as SET) prepared by Dr. George Bennett of The Psychological Corporation. The First National Bank has administered this battery of tests since 1951.

During the years 1969 through August, 1972 at the First National Bank of Montgomery 42.8% of the white applicants were tested and 35.6% of the black; 81.4% of the whites who took the test passed it whereas only 43.5% of the blacks tested did so. Thus, the plaintiffs have proven the tests have a racial impact and the burden of proving the tests are job validated passes to defendants. Peoples began giving employment tests after the number of applicants for employment increased from less than a dozen (12) a year to several times this number. The SET test was used exclusively at Peoples after its present personnel officer came to Peoples in 1970.

### THESE TESTS WERE LITERALLY DESIGNED FOR BANK EMPLOYEES

Dr. Cecil, plaintiffs' expert witness and a psychologist from the University of Alabama, conceded that the SET test is more job related than the Wonderlic Test, and that he would expect minorities to do better on the SET test.

The Court heard extensive testimony from Dr. George K. Bennett, the author of the test, and a person admitted by plaintiffs and their expert witnesses to be a distinguished authority in the field of testing. Dr. Bennett was president for twenty-three (23) years of The Psychological Corporation, which is also recognized as an outstanding organization in this field, and he continues to serve on its Board of Directors. He is a Fellow in the American Psychological Association.

The Court does note that prior to endorsement by the American Bankers Association, test scores of over thirty thousand applicants for bank employment were analyzed. This involved the cooperation of one hundred twenty-six (126) banks in thirty-two (32) states and the District of Columbia with one hundred thirty-one thousand (131,000) employees. The data on these cases were subjected to expert analysis. *Clerical Testing in Banks*, (FNB Ex. 7).

These tests since their adoption have undergone a number of empirical validity studies. Fifteen (15) of them are reported in the 1972 Revision of the Test Manual (FNB Ex. 8, Table 8), three (3) of which concern banks (Table 9). Initial and continuous studies of these tests have demonstrated that they accurately measure job performance. As found earlier, each of the three (3) abilities measured by the tests is essential to the satisfactory performance of some kinds of clerical tasks. The verbal test samples the examinee's knowledge of the meaning of words, all words having been selected from the "general" area to avoid the requirement of specialized vocabulary. Word knowledge is essential for those who prepare correspondence and reports, or interpret and apply written instructions.

The numerical test measures the examinee's speed and accuracy in performing simple arithmetic operations of a type involved in a great variety of clerical tasks, particularly in a bank.

The clerical aptitude test requires the examinee to locate names in an alphabetical list, and to read and code the amount associated with each name.

These three (3) five-minute tests were designed to provide those kinds of scores which are most effective predictors of satisfactory performance of clerical work in banks. The tests were prepared after months of study, analysis and on-the-job evaluation in an effort to achieve maximum relationship of the tests to the bank jobs.

The content validity of these tests is almost self-proving. The requirements for success on the clerical bank jobs are reflected in the tasks required in the tests. Moreover, in order to satisfy himself that the nature of clerical work in both FNB and Peoples required these same abilities, Dr. Bennett observed tellers and proof machine operators at work in both Banks on June 22, 1972.

Dr. Bennett approved a local validation study which was conducted at FNB in cooperation with The Psychological Testing Corporation. Of the 31 proof machine operators, 15 scored 100 or more points on the SET total and 16 scored 99 or fewer points, the lowest being 83. Of those scoring high, 6 were rated as satisfactory and 9 were rated as superior. Of those scoring less than 100, 15 were rated satisfactory and one was rated superior.

Dr. Bennett also computed a point-tetrachoric coefficient of correlation based on this data which resulted in a value of .58, significant at the 1% level. Of the 44 tellers, 19 earned total scores of 110 or better on the SET and 25 earned scores of 109 or less, the lowest being 74. Of the high scoring group, 14 were rated as superior and 5 as satisfactory and 5 as less than superior. Of those with the lowest scores, 9 were regarded as superior and 16 as less capable. He also computed a point-tetrachoric coefficient of correlation on these individuals. The coefficient was .37, again a highly significant figure.

Both groups tested at FNB—that is, tellers and proof machine operators— had some minority members. While the study at FNB was not restricted to minority employees, most recent data available to Dr. Bennett from banks throughout the country indicated that, contrary to earlier and erroneous assumptions, the validity of these tests is not appreciably different for majority and minority groups.

Dr. Bennett's professional opinion, without qualification, was that the short employment tests are adequately validated by virtue of content; by virtue of validation studies in other banks throughout the country; and by the local validation study conducted at FNB. He testified that clerical job requirements in banks throughout the country are sufficiently similar so that tests validated in one section of the country will not vary in any significant degree from those in another. As already noted, nationwide studies under the auspices of The Psychological Corporation have resulted in a large number of independent validations of the particular tests administered by FNB and Peoples.

Dr. Bennett testified without qualification that each of these pre-employment tests was professionally developed; was adopted after meaningful study of its relationship to job performance ability long before the passage of the Civil Rights Act of 1964; is predictive of or significantly correlated with important elements of work behavior comprising or relevant to jobs of bank tellers, proof machine operators and bank clerks; fairly measures the knowledge or abilities required by these particular jobs or class of jobs; fairly affords the bank employer a chance to measure the ability of applicants to perform these particular job or class of jobs; and each has been validated in a professional manner.

Moreover, Dr. Bennett testified without qualification that each of the tests is demonstrably a reasonable measure of job performance; none of the tests was or is maintained to discriminate against

black persons because of their race; none of the tests was or is used by defendants to discriminate against black persons because of their race; the tests are predictive of the performance of the jobs of bank teller and proof machine operator and of other clerical jobs in banks; and successful job performance in clerical jobs and the ability to achieve the cut-off scores used in both Banks.

The Court has noted for the record and so finds that there is no pre-employment test, given and acted upon by any employer in the United States, or known to exist or yet devised, which has been determined by EEOC to meet the requirements contained in Regulation Paragraph 1607 (29 CFR Paragraph 1607). Dr. Bennett testified, as did Dr. Carl Cecil, an expert witness for plaintiffs, that a differential validity study is not technically feasible; that these tests have been chosen on the basis of a careful job analysis; and that reliable relationship found for whites will hold true for blacks.

Plaintiffs' expert, Dr. Cecil, and Dr. Bennett agree that it would be impossible to conduct a meaningful validity study at Peoples because of the small number of employees.

Plaintiffs' expert, Dr. Cecil, testified that Psychological Corporation was "one of the better psychological testing companies"; (Dep., p. 104) and that Dr. Bennett "has an outstanding reputation in the field of testing" (Dep., p. 105). Dr. Cecil testified that the clerical aptitude and numerical tests "are about as free from minority bias as you could reasonably design a test for the type of clerical jobs [at defendant Banks]." (Dep., p. 126).

Moreover, Dr. Cecil testified that he did not know "of the existence of any tests which are any more reasonably designed to test applicants for bank jobs such as tellers, bookkeepers, proof machine operators, etc. than these SET tests." (Dep., p. 130). He knows of no clerical test in existence anywhere on which blacks as a group do not score

lower than whites (Dep., pps. 133–134). And he, too, knows of no tests anywhere in the country which have ever been validated or approved by EEOC for use by any employer (Dep. pps. 134 and 189–190).

Dr. Cecil agreed with the Manual 1972 Revision (FNB Ex. 8, p. 3) which concluded that all three (3) of the SET tests "have been directed at a level of difficulty which makes them suitable for clerical applicants." (Dep., p. 187).

Dr. Bennett and The Psychological Corporation concluded that the local validation study conducted by FNB substantiated its continued use of the SET tests. The efforts of plaintiffs to undermine this validation study border on the frivolous. Obviously the most effective validity study would require that FNB hire one hundred (100) or more new employees—half white and half black; give them the pre-employment tests; put them to work (though by hypothesis there would be no work for them to do); and at the end of a period of time rate them and compare the ratings with their test scores. This process—costing as it would several hundred thousand dollars—is not only unfeasible, it is practically impossible.

Quite apart from the fact that the manual revision and Dr. Bennett's testimony show substantiating validity studies elsewhere in banks which have similar job classifications, FNB did the next best thing. It used routine departmental supervisor ratings of a designated group of tellers and proof machine operators; converted these ratings to four common grade categories; and compared these on-the-job ratings with the test scores.

The arguments presented by plaintiffs and Dr. Whitlock in an effort to undermine this validity study are faulty.

They argue that departmental supervisors are not sufficiently familiar with the job requirements of the tellers and proof machine operators whom they supervise. They argue that a supervisor does not know what he is called upon to

do when asked to answer the question "How well does the employee perform his work, both as to quality and amount?" (Plaintiffs and Dr. Whitlock contend that this question is "imprecise and unclear.") Dr. Whitlock conceded that his knowledge of what bank employees do was derived from being in a customer line at a bank teller's window.

They argue that also "unclear", "undefined", "vague" and "general" are the categories to which the narrative evaluations are correlated; these are: "Unsatisfactory, satisfactory, very satisfactory, and excellent." This Court knows that these words are regularly used by graders in all kinds of undertakings.

Finally, plaintiffs and their experts assume—contrary to the undisputed evidence in the case—that those who rated and graded already knew the pre-employment test scores. The assumption must fall when compared with the uncontradicted testimony.

■ Accordingly, this Court finds from the overwhelming weight of the evidence that the pre-employment tests administered at FNB and Peoples—on the basis of content and on the basis of reliable validation studies—are demonstrably a reasonable measure of performance of clerical positions at those Banks; and that there is a manifest relationship between these tests and the jobs for which their passage is a prerequisite.

## BACK PAY

Plaintiff, Mamie R. Henderson, and plaintiff-intervenors, Amy Hawkins and Leola Burrell, and the class they represent have waived the relief of back pay; thus this is no longer an issue in this litigation.

## INJUNCTION

The Courts are interested in the present terms and conditions of employment as related to Title VII of the Civil Rights Act of 1964, and Title 42 U.S.C., Section 1981. Substantial efforts on the part of the defendants to remedy historic or traditional segregation have alleviated the necessity for Court-imposed injunctive relief.

## OTHER

The Court feels that if the First National Bank of Montgomery had not relied on its personnel replacement program principally on referrals from present employees during the calendar years 1966, 1967 and 1968, it would have had more class members employed today. The Peoples Bank is not as infected here as in the FNB mainly because its development as an employer had had its greatest impetus in the last several years during which greater emphasis on hiring minorities has occurred.

## CONCLUSIONS OF LAW

■ 1. An employer may have no justifiable reason to refuse to employ a specific individual and may have completely blundered in failure to employ same, but as long as there was no discrimination involved, this employer is not in violation of 42 U.S.C., Section 2000e et seq. Once an employer has overcome the prima facie case, plaintiffs must prove they were discriminated against individually and they were treated differently than other job applicants.

■ 2. The complaint in a Title VII trial must carry the intent burden under the statute of establishing a prima facie case of racial discrimination. In this case plaintiffs, namely Mamie R. Henderson, Amy Hawkins and Leola Burrell, charged that they were denied employment because of race. Proof of this may be done by showing:

A. That plaintiffs' belong to a racial minority, a proven fact in this case;

B. That they applied and were qualified for a job for which the employer was seeking applicants. (Mamie R. Henderson being shown by the evidence to be unqualified, Amy Hawkins being shown by the evidence as not to have been available for permanent employment as desired by the employer, Leola

Burrell having been shown not to be qualified for the position or positions for which she made application);

C. That, despite their qualifications they were rejected, (as above stated, two not being shown qualified and one not seeking permanent employment); and

D. That after their rejection, the position remained open and employer continued to seek applicants from persons of complainants' qualifications. McDonald Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, 1973.

For the reasons specified in the above opinion and in cases therein cited and based on the evidence produced in this trial a prima facie case as to these individuals was not proven.

3. Considerable evidence in this case was directed to the intent or lack thereof, on the part of the defendants to discriminate insofar as their personnel practices was concerned, with considerable testimony going to the issue of lack of intent as reflected by the volumes of testimony concerning their efforts in the community to encourage minority members to apply for and accept employment with the Bank. Intent is not the only gauge for determining the existence or lack of existence of discrimination. The effect of prevailing conditions or past conditions existing which were carried over, with or without specific intent may nevertheless reflect present discrimination. Relief is to be granted, absent present intent to discriminate or upon an affirmative showing of present good intentions, if past practices so infect the present that the carry over effect is still not eradicated. Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, Rowe v. General Motors Corp., 5 Cir., 457 F.2d 348.

4. Title VII of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e et seq. operates only prospectively; the Courts being concerned about the terms and conditions of employment alleged to violate Title VII since the effective date of Title VII. Peters v. Missouri Pacific Railroad Co., 483 F.2d 490, (5th Cir. 1973). First National Bank and Peoples Bank and Trust Company are currently in compliance with Title VII.

5. Plaintiffs' evidence established pre-Act racial discrimination; but a pre-Act racial discrimination does not alone establish a per se violation of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C., Section 2000e et seq. U. S. v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), Peters v. Missouri Pacific Railroad Co., supra.

6. Relief can be granted in the absence of a present intent to discriminate and even in the presence of a showing of present good intent towards alleged discriminatees. Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, Rowe v. General Motors Corp., 5 Cir., 457 F.2d 348. Where past acts of discrimination have a carry over effect on the class, they are entitled to relief. Such a carry over effect is shown by the evidence insofar as FNB is concerned as set out infra.

7. Once plaintiffs show employment tests have a discriminating effect, the burden shifts to defendants to prove the test validity. Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972). Plaintiff and plaintiff-intervenors have met their threshold burden of proof in this cause. The burden of coming forward having shifted to the defendants, evidence was introduced which adequately met that burden and clearly demonstrated the job relatedness of the tests employed and that their application was not handled so as to discriminate. The problem is not one of the tests employed, but an adequate source of supply from which to secure competent and qualified help.

## ORDER

The Court finds that as a result of past discrimination by the First National Bank of Montgomery the present hiring policies have been infected to some degree and that the same should be eradicated. In so doing this Court is not to be understood as concluding or directing that it is required that

the First National Bank of Montgomery establish quotas or ratios for to do so would be contrary to law. In an effort to eliminate the present effect of this past discrimination it is hereby ordered that this Court shall retain jurisdiction of this litigation for so long as the Court finds it necessary in order for the Court to review on a quarterly basis the present efforts of the First National Bank of Montgomery to employ qualified members of the affected class and during such period of review the First National Bank of Montgomery is to suspend the use of the employment tests now employed as a screening device for black job applicants.

Each quarter following the date of this Order the First National Bank of Montgomery will file with the Clerk of this Court a statement in writing setting forth the total number of employees employed by the Bank and breaking this down as to the number of affected class members, vis-a-vis, all other employees. This Court does not suggest or direct that it shall be necessary for the First National Bank of Montgomery to employ any person of the affected class who is not qualified by the employment of objective criteria, to hold the job for which such applicant seeks employment, but the report to the Court shall set forth a general summary of the reasons why applicants were considered unemployable.

It is further ordered that the Peoples Bank and Trust Company, not found to be so infected as the First National Bank of Montgomery, but nevertheless infected to some degree, will likewise report to this Court on a semi-annual basis the same information required of the First National Bank of Montgomery. It is the Court's opinion that the foregoing is necessitated by the testimony in this case that in the main the majority of the new hires by both Banks come from referrals from employees presently employed at the Banks and so long as there remains a large disparity between the affected class employees and others this imbalance is likely to continue.

The Court further orders that the plaintiffs' attorneys are entitled to recover their reasonable attorneys' fees from the defendants, the amount of such attorneys' fees to be determined by negotiation between the parties, ⅔rds of which are assessed against the First National Bank and ⅓rd against the Peoples Bank and Trust Company. In negotiating the amount of such attorneys' fees, all parties are to give due consideration to the efforts of counsel and the time involved, but tempering this by the fact that some of the activities of plaintiffs' counsel have not met with success and were injected into the litigation needlessly. In the event, within thirty days of this Order, the parties have not been able to agree upon the amount of such attorneys' fees, they are to promptly notify the Court who will cause this issue to be set for further hearing and determination by the Court.

It is further ordered that the costs in this cause be taxed against the defendants, ⅔rds against the First National Bank of Montgomery and ⅓rd against the Peoples Bank and Trust Company.